The next matter is In Re Home Bank Mortgage Corporation, Debtor, Wells Fargo versus Bear Stearns. Good morning. May it please the court, my name is Stephen Corr and along with my colleague John Morris, I represent George Miller, the Chapter 7 Trustee of Home Bank Corporation. At the outset, I'd like to reserve three minutes for rebuttal. Granted. This case involves nine securities held by Bear. Right. Before we get into those basic facts, let me begin, as we always must begin analytically in any event, with a question concerning the applicable standard of review here, because there is a difference in the positions taken in the briefs as to what the standard of review is that we ought to apply. And so I would ask you if consistent with case law of this circuit, and in fact some case law from many years back, starting with the Supreme Court, are we dealing with, at least as to the determination ultimately made with regard to good faith, something that is an ultimate fact that would thereby be subject to plenary review by this court? I believe the answer is yes. You're subject to certainly plenary review with respect to the interpretation of the bankruptcy code, which is an important element of our claim. But what we have here is a situation where various historical facts have been decided by the bankruptcy court, of course subject to review by the district court. But that body of constituent facts then leads to an ultimate determination of good faith or the lack thereof, in this case of good faith. And so it's not a situation where you have a fine distinction between a principle of law, which we clearly review subject to a less deferential standard, or finding a fact that we defer to to a great extent. So do you buy into this ultimate fact theory? We do. And I believe that has been the position we took in our papers on the standard of review, that while historical facts, things of that sort, are given the deference and subject to less scrutiny, the ultimate fact where you take all those determined facts and put them together and decide whether or not that's a rational evaluation method or whether that's good faith, that is subject to plenary review. It's essentially a question of law. All right, sir. I interrupted you and want you to be able to get back to your argument, but I can assure you that the panel has more than read the briefs, and we really do know what the operative facts are here. But speaking for myself, in any event, this is not a mine run question of bankruptcy law, at least in my limited experience. We've got what appears to be a rather complicated statutory structure here that I'd like you to explain to us, to explain the interaction of 101-47-A-v together with the other sections of the statute that we must decide do or do not apply. Sure. By doing that, could you factor in the extent to which, if at all, the good faith finding drives or informs the application of 559 in the safe harbor? If there's no good faith, is 559 still a flaw? Well, certainly, if there's bad faith, that's pretty bad and that's ballgame. But why? You don't need to get there. But walk me through. You may well be right. Visually, it seems like that makes an awful lot of sense. That way the bankruptcy code is structured, if you're going to be relieved from the automatic stay under 559, if you still can pursue your rights as a creditor, you've got to do it in good faith. Without question. When you say without question, textually, lead me through. Where's that coming from? Definitions? Well, no. Where you get there is, for example, when you take a look at, first, the determination as to whether or not you're entitled to stay relief at all. That's a bankruptcy interpretation question. And the critical problem in this case was that Bayer failed to appreciate there were two different types of securities, two different types of collateral, which had a material difference in terms, under the bankruptcy code, as to the extent of the stay relief protection. They really failed to appreciate that? They bought, of the nine securities, and I guess this was pursuant to three different transactions, some of them didn't all get acquired at the same time. That's right. They came over a period of time for no money, the so-called zero purchase price repo. So they were bundled with other securities where there was a lot of compensation. Well, I'm not sure the word bundle is a good one. The court rejected. That's kind of a backdoor bucket theory. I don't mean to get into the bucket theory. And when I say bundled, I'm talking about the common sense bundling, not bankruptcy bundling. Nothing about common sense applies to bankruptcy that I can see. I would agree with you on it. They came as part of other securities at different times with no money against them, which makes all the difference in the world under the bankruptcy code. Does that make them credit enhancements? Yes. So it's your position they're definitely credit enhancements? The nine are credit enhancements. No question about it. The nine are credit enhancements. Unless they have value. In that sense, they do have some value. They're there to enhance the credit. No question about it. But your right to get to them is limited. And you first have to determine whether or not, for example, there is a debt or deficiency that they secure before you determine whether or not you look to that collateral. If the 28 traditional repos were sufficient to satisfy the debt, then you must return them. You violate the automatic stay when you continue to hold them and you continue to collect the collateral, which is what happens. That obligation goes out of the GMRA text or out of 559, the definition? It applies out of the definitional section of the bankruptcy code that the court mentioned up front. Repurchase agreements get safe harbor protection. What does that mean? You have different types of repurchase agreements. For example, traditional repurchase agreements get the maximum protection. Credit enhancements get limited protection because they're not true repos. So you can look to them after you've determined that your traditional repos do not satisfy the debt. You have additional collateral. We give the example of an office building and you're collecting rents. If you have a series of collateral and the traditional collateral, in this case the 28 repos, satisfies the debt, you don't get to keep the rents forever and you don't own the office building. Let me return to my very basic question, which is intended to help me understand in any event. And that is, walk us through the application of the statutes here. But most particularly, you're the appellant. You believe that Judge Carey and ultimately Judge Andrews erred here. Walk us through the statutes explaining why they were wrong. So we start with the determination as to whether or not the collateral, the 28 repos, and the nine securities at issue are repurchase agreements under the code, subject to some type of safe harbor protection from the automatic state. And we've got that whittled down under 101 solely to little v is what's happening. Part five. Part five to correctly characterize the Roman numeral. So that's what's left after. So those in the definitional section, they are repos but to a limited extent. They are repos but not to exceed the damages calculated, and this is where it gets complicated, sends you to another section of the code for the calculation methodology. Well, complicated or not, it probably is. So we are left to have to determine, to have to interpret what is meant by the term damages as used in the five, subsection five here. And as I understand it, the determination in the district court, the bankruptcy court, is that they were not damages. And that was a plenary error. Where is the term defined? Not defined in the statute. Not that I'm aware of. But it's defined by common sense. And even the court's baseline decision. I don't think I disagree with you there. So in common sense, what does a litigator ordinarily think damages are in the course of litigation? I think the damages are the recovery to which you may be entitled if you prove some liability. So you got liability, you got damages. In this context, where you're a lender, what can be your possible damages? Well, as a lender, you have a debt you're entitled to be repaid. Now, in addition to that, you may be entitled to collection costs. So who is damaged and how? So in this case, the lender, who is damaged in the sense, there's no question, Home Bank breached its obligation to repurchase the securities. And that gave Bayer, as the lender, certain rights. But the right, the maximum right, was to be repaid for the debt plus interest and perhaps collection costs. What's the measure of damages here? The measure of damages is the deficiency. What is the remainder of the debt? What is your remainder of your debt after you credit Home Bank for the value of the 28 securities which you own outright? Those are traditional repos. Once you determine their value in good faith, appropriately, using the proper methodology, the shortfall, if any, are your damages. Was there a shortfall? Was there a shortfall in this case? We don't know because they never did what they were supposed to do. We don't? We don't. We know by calculating after the fact that there was an $8.1 million approximate shortfall after you credit the value ascribed to the 28 others. Is a shortfall the same thing as damages? The shortfall. Congress, of course, could have used that very word. They could have said loss or debt, but they didn't. Yeah, because it encompasses more than that. In the context of a lender, your damages can only be you didn't get repaid. And what was the, how much didn't you get repaid and perhaps some interest and some collection costs? You have to view it in the context of our situation and a lender. Lenders are entitled. Loss plus cost equals damages. Correct. Some interest. Absolutely. We would submit that as the only rational interpretation of the statute. And that was the interpretation in this court's Kahlon decision in a different context. The damages were the shortfall in the debt. In the context of a repo lender, we have to remember this is a lending transaction. Whether it was an article nine transaction or a repo transaction. The significance of the repo is the protection you get from the automatic stay. Other than that, it's a lending relationship. And the reality is what happened here. And I see red is screaming at me. There are some important questions here. What happened here is there never made the determination as to what is the deficiency to which these securities at issue would secure to the amount of the deficiency. By lumping them all together and making an all or none bid. That was the first violation. How do you determine whether you have a deficiency in a debt if you first sell everything and never calculate whether, in fact, the traditional repos would satisfy the debt? Then there's no deficiency. Are all or none bids just per se bad fate? I don't know. I can't say that all or none bids are. I think under the circumstances of this case, yes. You have to separate the collateral. And when you lump them together, you violated the bankruptcy. Well, there's not the one. There's not the one that breached this agreement. They're the ones that were left with security. They wanted to get paid back. And so it seems strange to say that the entity who was left with something that they didn't want now can't use an all or none way of trying to apprise that value. It seems like we're putting an awful lot on the entity that is stuck with securities, that it doesn't want. It's a financier. It's not a securities firm. And then on top of that, you say, oh, you now have to value them individually, and time is more or less of the essence. Well, time, if I may, time is not quite of the essence, as Bear would suggest. As to the 28 repos that are traditional, they already own them. They don't have to sell them. They can keep them. Their only obligation to Home Bank is to honestly and rationally value them for purposes of crediting. That's what the GMRA requires of them, right? No question about that. They have to obtain the fair market value of the securities. Exactly. All right. And that's what they need to do to meet whatever definition we place or whatever meaning we place upon good faith. So how did Bear Stearns violate any obligation under the GMRA of good faith? Well, putting aside the violation of the automatic stay by the manner in which they did it and how they lumped them together didn't determine the deficiency and then took the additional collateral, if we take a look at how did they violate the GMRA, Bear tells you they never valued these securities at issue, ever. They tell you their lump sum bid was not a valuation. They tell you that the allocation the next day where they ascribe $900,000 apiece to securities, which have totally different characteristics and a number which is arbitrary and capricious on its face, then they're precluded from explaining how they arrived at the all or none bid because of a discovery sanction. They were asked how you come up with these values. They have to be rational. They can't just be a number which coincidentally pays off the debt so you can keep securities, which then go on to cash flow another $90 million. When does the valuation take place? When should it take place? The valuation, there is some discretion that is afforded to Bear both under the GMRA and under the code. They are certainly free to value them as of what we call the default date or as of that date. However, there is discretion both under the bankruptcy code itself and the GMRA. If the markets are such that you can't determine a fair market value due to market conditions, you have the right contractually and under the code to defer that valuation date until the markets correct themselves and you feel you're in a better position to do that. So there is some discretion afforded. So let's suppose it wasn't Bear that submitted the lump sum, the all for one bid, but let's say someone else did. Is that now just a totally improper valuation method because someone else did it? It wasn't Bear. Is the rule only that Bear can't do an all for one? What if there was another bidder? The problem is they can't sell them that way. They have to separate them. They don't own and have the right to just dispose of the securities at issue. They couldn't do that to some third party. So you want us to say that the GMRA requires under its good faith requirement interpreted consistent with English law that all or nothing bids are bad faith? I didn't say that at all. I said that's a violation of the bankruptcy code, which treats them differently. And until you know, for example, if you put the 28 up, you put it up any way you want. There are no restrictions. You own them outright. You get whatever you get. If you want to put the securities at issue, the nine of them up separately and see what kind of bid you get, whether somebody bids for all nine of them or doesn't, and you do that, and there's a third party, and you do it honestly and in good faith and not sell it from one pocket to the other pocket, and somebody walked in and bought them, that very well could be the fair market value for those. Mr. Corn, just assume that we make that we were to make a determination that Bear Stearns acted in good faith compliance here with the GMRA. Shouldn't we then also assume that the auction constituted a commercially reasonable determinant of value? No. Why? Their minds. I'm sorry. At least in their minds. Well, on the good faith front, so to speak, I would submit that the answer to that is no. You have a duty to explain your valuation. You can't just pull a number out of thin air and say that's our value. If you can't explain how you came up with it, that is by definition arbitrary. What were their alternatives? And didn't you actually suggest a trial before the bankruptcy judge, other methods of valuation? Yes. And the bankruptcy court rejected those, did he not? At least one other what means. Well, I think what the bankruptcy court did not reject the discounted cash flow methodology as a legitimate methodology. I think everyone would agree it is certainly a legitimate methodology. What the bankruptcy court unfortunately didn't treat these securities as credit enhancements. When we tried our case, we were denied the opportunity to argue the distinctions between the 28 traditional repos and the nine securities at issue. Because the bankruptcy court decided that was outside the scope of the remand. So we were not even permitted to try that case to differentiate between those securities. All right. Mr. Cord, we will, of course, have you back on rebuttal. Thank you. Thank you. Mr. Hayworth. Could we start with the standard of review issue that I led off with with Mr. Cord? Sure. May it please the court. James Hayworth from Civilian Austin LLP for the Bexar Appellees. No, we disagree. The standard of review with respect to interpretations of the bankruptcy code is plenary. But good faith, the reasonableness of the auction, those are pure questions of fact that are subject to error review. What's your authority for that? There's a Third Circuit authority cited in our brief. And if you'll give me one second. DeMarco, I want to say it's escaping me. Well, in any event, we can look at your brief. But my rejoinder would be that this court has made determinations of good faith in the past, the distant past, 1938, for example, and determined that good faith was an ultimate fact. That was the Hickey versus Ritz-Carlton question on the hotel case. The case that's cited in our brief is DeFederico. It's 201 F. 3rd 200. And I believe it speaks to determinations of good faith being subject to clear error review. And if you think about it, I mean, if this case wasn't in front of a bankruptcy judge but instead went to a jury, that jury and only that jury would be tasked with determining based on the facts whether Bexar exercised discretion in good faith. This is admittedly a softball, but the standard of review is always important for us. But from your standpoint, does it matter? No, it doesn't. All right. Tell us why. All week long, we've been seeing people swing at softballs and miss them. Yes. That one was Adam Clark. Yeah. Well, I'd like to dive in just to the 562-10147-A issue. And if you could, let me just. And this is a policy question which we can't really consider. But I've been wondering, you know, I'm going to ask Mr. Kwon the question. Given the way this thing was structured, if we were to conclude that what you did does not fall within, does not allow you the additional remedies that would be taken away vis-a-vis 559, if you didn't get relief from the safe harbor protections, what would that do to these kinds of deals and these kinds of lenders? It seems to me it would kill it. Absolutely, Your Honor. I agree. It's tough to interpret what the statute says. And we'll get into that. But this interpretation that you're supposed to look at the collateral and somehow there are two different types of repurchase agreements that are subject to different types of stays is entirely inconsistent with the way this daily mark-to-market overnight repo lending market works. You could get rid of that by drafting the GMRA. I'm sorry? The way to draft the GMRA to cover that kind of scenario so that the lender would still have relief from the automatic stay. You're saying that is the way things work. The way things work now. Some of the way things work are because of the obligations coming out of the GMRA. And that's flexible. That's decided by the parties. I don't know how flexible it is given market realities. But there may be a way to draft around that. That's what I'm wondering. There may be. But the GMRA here said, you know, repos. And the bankruptcy code says repos. It doesn't separate out different kinds of repos. But it could. At least the GMRA could. The bankruptcy code is what it is. The GMRA could. But the way that this market works is that you have to value. Following a counterparty default, what you have to do is value the securities as of that moment. I mean, the entire scheme is towards immediate liquidation or valuation. The parties net their obligations, and they go their separate ways. Same thing to get at. But just to tease out the policy angle, would it be bad policy, and I know it's not our role, it's not our lane, if the bankruptcy code had all repos except for credit enhancements exempt from the automatic stay, but then credit enhancements would still be subject to the automatic stay because those are probably just a small fraction. They aren't going to collapse the liquidity markets. They aren't going to do anything like that. They're just a little, you know, a sweetener maybe. That's not bad policy, is it? I think it's unworkable policy. I think we've been litigating this for 10-plus years to figure out whether these were even credit enhancements to begin with. I mean, our position is that they were repos. The trustees' position, they're not repos. The way this stuff is transacted is credit enhancements and, you know, other support get grouped in with the repurchase agreement collateral. It's all one big group of collateral. All right. So I asked Mr. Corrin to walk us through the application of the statutes from his perspective with a view toward telling us why the bankruptcy court and, in turn, the district court got it wrong. From your standpoint, I assume you're going to dance with the one that brung you. So tell us why the bankruptcy court got it right. Sure. And I'll start with 562, and then I'll do 101-47. The purpose of 562 is that if a repo participant terminates a repo agreement, its damages, if it has any damages, shall be measured as of the date of the termination. It's the policy that we've been talking about, right? You need prompt, immediate liquidation and valuation so the parties can go their separate ways. The trustee focuses entirely on the exception to that rule, right? But that's the rule. 562 is about the timing of damages, not how you calculate damages. I think he called it a damages methodology. It's about timing. So the 562 damages need to be measured as of the liquidation. The Callion case in this court, and Judge McKee, you likely remember, you were on the panel. Those two are not the same thing. That's my colleague's law test. Didn't answer the case, but you're correct. Well, anyway, Callion, as I'm sure you've seen in the papers, it discusses why this is so. There's a moral hazard if Bear Stearns decided to just wait and see what happened, right? The value of that collateral could go down. It could go down to zero, and Bear Stearns could assert a deficiency claim against... Waiting in the climate as it existed in 2007, late 2007, which was not good, but not what it turned into in late 2008, would not have been an economically rational decision to make, would it, waiting? No, it would not. Had we waited, I don't have any doubt that we'd be standing here and the lawsuit would just look different, and we were irrational and acted in bad faith for waiting. You can't just wait. I mean, 559 tells you you get a market price, and 562 tells you, also, you can't wait. You only can wait. There's one exception. You can wait if you determine there are no commercially reasonable determinants of value, and if you make that determination, you have to prove that there were no commercially reasonable determinants of value. In the record before the bankruptcy court, there was frequent invocation of the term market dysfunction. What does that mean? You know, I only did the equivalent of minoring in economics, and as Judge McKee just suggested about remembering and having some participation in something, I can apply the same thing to my recollection to a great degree of economic principles, much as I try to keep up a little bit, but dysfunction is not an economic term as I understand it. So what is the importance of the testimony referring to market dysfunction here, if any? Does it help us in any way? Does it help either side in any way here? Well, it establishes that the trustee failed to prove that the market was dysfunctional, which is a pillar of his claim that Bear Stearns couldn't, you know, use an option methodology because the market was dysfunctional, thereby they acted irrationally. Well, is market dysfunction a one-way street? Is it dysfunctional only when things are sliding downward? Because recent history has had the former head of the Fed referring to irrational exuberance, whatever that is. That's also not an economic term I'm familiar with, but it was... Irrational or exuberance? Both. It is, at least I think was part of his testimony at one point before Congress. That, of course, was looking to a market or markets that were apparently overenthusiastic and overpricing. So I'm trying to figure out just how much importance for the bankruptcy court and ultimately for us, historical context has for us in our eventual determination. And what the terminology being used at trial before the bankruptcy court meant. If time was of the essence, as I assume you're arguing effectively that it was. Absolutely. Was it, are you relying upon market dysfunction at the time? No, I agree that it's not an economic term, it's not a legal term. There's one, I mean the Callion case, the parties both agreed, I believe they stipulated the market was dysfunctional and if they had held an auction or some other sort of market sale, market check, it wouldn't have returned a reasonable, determinative fair market value. That's not the case here. There are good markets, there are bad markets. It was a bad market, right? Absolutely. But there was the existence of a market at the time from your point of view, right? Of every witness that testified. I mean the trustee will get up here and say that a witness testified that the market was dysfunctional. One witness out of I think 14 said there was quote unquote dysfunction. Everyone else said the market was open for business. Obviously it was a bad market. Prices had declined, that's why we found ourselves in this situation. So because it's a bad market and coupled with the statutory obligations, you've characterized it in 562 that governs timing. Bayer wants to make a quick determination of value. It sounds to me like the fault lines are drawn, the battle lines are drawn in this case. You say on behalf of your client that this auction was a good way of doing it. The statutory required, the commercially reasonable, the good faith reason and your opponent says no, you had to do a discounted cash flow. Why didn't Bayer just do a discounted cash flow? I mean we wouldn't be here. That seems to have everything solved. It's one of the most reliable methods. The circuit said it's a good method too. If you would have done that, we know that's a commercially reasonable method. There's no doubt about that under precedent. What we're asked to decide now is whether this auction where Bayer can bid with different desks in its own auction, whether it's commercially reasonable. So let's say we know that you have to do it quickly. Why didn't you use a discounted cash flow quickly? A few things. One, I don't think that we would be here had we run a DCF. We would just be defending the inputs of the DCF. More importantly, that wasn't the way this was done. A DCF is a tool that market players use to come up with their own valuation, but the witnesses testified unanimously, consistently, that this is the way these bonds are sold. When you need a valuation, you do a market check. You go out to the market. You see what willing buyers and sellers are going to transact. But we know from the testimony that this market was very illiquid. Liquidity, not everyone had liquidity. So Bayer is selling it between its own entities. Did they have to come up with the same degree of, I guess, cash or liquidity when it's selling it from one desk to another? Because it would seem that they have a huge advantage if they can just offset that through some accounting method where a third party would actually have to come with real, for lack of a better word, liquid cash to buy. Two things. I don't want to fall into the trustee's trap of saying that this was two parties acting in cahoots and just taking money out of my pocket. Let's assume that all your safeguards are there for price point, but that there's still – so my question is, is there still a liquidity advantage to buying from yourself because you might have some accounting way of not having to come with the same wheelbarrow full of cash than one else would need when liquidity is at a premium? The repo trading desk had risk there, right? They had $60 million that they were owed, right? And it secured risk. They – taking that risk and the trading desk buying that, all of a sudden that risk is still in the building. It's just over – it's an unsecured risk that now the trading desk has. It's great that at the end of the day these things cash flowed and made them whole. But that's – we only know that in hindsight. At that moment, Bear Stearns' trading desk, those things could have gone to zero and they would have been out $60 million that they otherwise would have had. So what you're saying is that the trading desk took that risk. If they would have gone to zero, we probably wouldn't have this case. The fact is that they went up in value and now we have this question about valuation. Yeah. Okay. I mean, you don't have to write a check. I mean, he says there needs to be a cash exchange or some writing of a check. I mean, there was real money here, right? I mean, the Bear Stearns' repo desk didn't know that the Bear Stearns' trading desk wasn't going to get sort of topped. So that's why they acted in good faith. And the trading desk is taking on an awful lot of risk. That's real money. I mean, it's not like just – he calls it a credit bid. But at the end of the day, had these things not done as well as they actually did, that's a loss. It's a loss for Bear Stearns. I see my light is red unless there are other questions. Thank you very much. We'll have Mr. Kornbackman rebuttal. May I have the softball to start, please? I'm working on one. I'm looking for a reliever, though. Thank you. The liquidity point is a critical point as to whether we call – whether dysfunction is an economic term. Dysfunction comes out of Third Circuit case law in terms of – Are these opinions? I think actually it was – May well have been Judge Rendell's either dissent or concurrence or one of these where they were endorsing the discounted cash flow and said, that's the methodology you use rather than the sale into a dysfunctional market. So everybody's been running with the term dysfunctional. But all it means, if you look at the dictionary, is a market not functioning normally or properly. I think everybody concedes that was the case. Of course, that was used in a concurrence, wasn't it? Excuse me? That was used in a concurrence. I think it was. I think it was. I think we footnoted it in our brief somewhere, but I couldn't find it quickly as I was looking. But the liquidity point is an important one. The record is clear. There was no liquidity, and there's no evidence of any trading of mortgage-backed – residual interests in mortgage-backed securities. They're the very esoteric bottom equity tranche of a securitization. And, you know, difficult to – not difficult to value. They use discounted cash flow methodology to value them. But they have huge upside, potentially, as we can see from here. And the reality is because Bayer didn't have to write the check. They did an auction a week before. It's undisputed in an American home. Nobody showed up to buy the residual interest. Then they did the same thing the week later with Home Bank. Nobody showed up to bid on the residual interest, and they merely transferred them from one desk to the other. There was no sale. And I'd like to comment on the point of they had to move quickly. They didn't move quickly at all. What they did was move quickly to put out an auction that failed. They kept the securities. They never sold them. It's not like they kept them, and they kept the cash flows, until we learn in the disclosure statement in this case that they ultimately sold them, and we would submit that's the trustees' money as well. What should they have done? They threw a party, and they're the ones who showed up. What should they have done? Here's what they should have done. We accepted their value of the traditional repos. They credited us $52 million. We never challenged it. We didn't Monday morning quarterback them. We challenged how they treated the securities at issue very quickly. The debtor in possession filed claims very quickly. We didn't wait for $90 million of cash flows. We knew immediately that they had mistreated these securities at issue. What they should have done was there was a shortfall after they credited the $52 million. They had two choices, two options. One, they could continue to hold the cash flow in collateral until the shortfall was paid. That's what they did here. They held the collateral. At some point, relatively soon, the $8. million deficiency was satisfied. At that point, they're paid in full. They need to return the securities, and they don't get to keep the future cash flow. Option number two, step back and say, we kept these securities, the 28. We gave them their credit. We're still owed 8. Let's sell the 8 by themselves. Let's see what the market will pay just for these 8, not all or none. And if they did that in a good faith, appropriate manner, and somebody stepped up and said, we'll give you $10 million, there you go. I think that would have been just fine. What if the market was fully liquid, and there's no allegation of it being dysfunctional? Let's just say it's perfect market conditions. What if Bayer said, we've got the 28, and we're going to sell the 8 bundled with them, and we've got this wonderful price? It's the best price imaginable from not itself. Would that be permissible? No, not on the bankruptcy code. It would violate the definitional section in the automatic stay. You can't lump them together. They're different types of collateral. What section is that? That is the definitional subpart 5, where we give you repo status, but not to exceed the amount of the damages, which we call debt for simplicity's sake, properly determined. 47AV. Yes, sir. So once we've done that, now we know that in order for that to make any sense, you have to first determine if there are damages. You can't determine if there are damages by lumping all the collateral together. You can only determine if there are damages by valuing the true repos and then determining the extent of your additional protection. This strikes me as addition and subtraction. It strikes me as the commutative principle of you can add first and then subtract, or subtract then add. It strikes me as all those are equivalent. What about it makes it different? Let me try it this way, and, Shane, maybe it's clearer. Let's assume that the credit enhancements were not residual interest in mortgage-backed securities. Let's assume it's an apartment building, and it's the same protection. However, it's only to the extent of the damages remaining after the traditional repos are valued. Would your honor suggest, and we would submit it, it wouldn't make a lot of sense. We're going to throw out there, and somebody comes in and says, you know what? The debt is $60 million, Barris. The debt is $60 million. We bid $60 million, and we want to keep your apartment building, and we'll keep all the future, and we'll do this. That's essentially what happened here. The fact of the matter is they're both securities, but they're sufficiently different that they're entitled to totally different treatment under the bankruptcy code, and by lumping them together, that was violation number one. By assigning a value but then keeping the additional collateral after the debt was repaid, that was violation number two. They certainly had the right to keep them until the debt was repaid, but they had to return them afterwards, and they took $81 million of additional cash flows to which they were not entitled, and quite a bit in interest because they took them many, many years ago. Thank you. Thank you very much. Thank you to both of the counsels, not only for your arguments, but your very helpful briefs. And we thank you for that. We will direct that a transcript of the oral argument be prepared, and we'll take the matter under advisement. Thank you.